Between Robert Rennie, appellant, and William Crombie and others, respondents.

The will of Archibald Bryce, after alluding to the joint interest which he held with Robert Rennie in the Lodi print works, situated in this state, gave to the complainants certain legacies and annuities, and then charged said legacies and annuities upon all his property, real and personal, but directing, that so long as Robert Rennie should pay the legacies and annuities, he should not be interrupted nor brought to account, nor hindered nor molested in any way in carrying on said business. Robert Rennie was made executor, and proved the will in New York. The prayer of the bill was, that the property and interest of Bryce, the testator, might be devoted to the payment of the annuities and for the appointment of a receiver. The answer of Rennie denied the interest of the testator in the property and in the business, but the proofs clearly established the interest.—*Held*

1st. That to permit the complainants on a bill presenting that such an issue, to ask at the hearing for a decree making the defendant personally liable for the payment of the legacies and annuities would be a surprise, and that the prayer for general relief could not be resorted to for such purpose, that the relief granted under the general prayer must be consistent with that specially prayed for.

2d. That the property in question was subject, to the extent of the testators' interest in it, to the payment of the annuities; and that, as it was in Rennie's possession, the complainants had the right to follow it, and were not to be denied relief because the will was not proved in this state.

3d. That the complainants were entitled to an account and to a decree that these annuities be paid out of the testator's interest in the property in question.

This case was argued before the Chancellor, on the bill, answer, and proofs, and the appeal was taken from a final decree. The facts upon which the case turned are stated in the opinions delivered. The Chancellor furnished to this court the following opinion.

Williamson, C. The important question involved in this cause is, whether Archibald Bryce, the testator, had, at the time of his death, an interest in the Lodi print works, and in the business carried on there in the name of Robert Rennie, which the complainants are entitled to have ap-

propriated for the payment of their annuities. There is no one interested adversely to the claim of the complainants except Robert Rennie himself. The title to the real estate attached to these works is in Rennie; the business to which the works were appropriated was carried on in his name, as the proprietor and owner; he received all the profits; it is out of his real estate and out of these profits that the complainants claim to have their annuities secured. The annuities and several legacies given in the will are expressly charged upon all the real and personal estate of the testator. The substance and whole amount of the will is this—it gives all the estate, real and personal, of the testator to Robert Rennie, subject to the payment of the debts and legacies. Rennie denies that he has any property which is subject to the payment of the complainants' claims. If the answer is untrue in this respect, and the complainants have established the fact, that he has assets in his hands to pay their annuities, the court may decree him personally liable, notwithstanding there is no specific charge in the bill to that effect. There can be no doubt, if the defendant admits assets, a decree may be made against him personally, without a specific prayer for such relief. *Woodgate* v. *Field,* 2 *Hare* 211; *Rogers* v. *Soulten,* 2 *Keen* 598. With more propriety may such a decree be made where the defendant denies assets, and his denial is proved to be false. In *Rogers* v. *Soulten,* the defendant admitted the receipt of £2500, and stated the amount of debts, which left a balance more than sufficient to pay the legacies. But he, in terms, denied assets, and made an explanation of that denial. The explanation was not considered such as to warrant the denial, and a decree was made against the defendant personally.

In this case Rennie admits that he has in his possession the property designated in the will to pay the annuities; but he denies that it is liable to be appropriated for such purpose, alleging that the testator had no interest in it. He does not deny its sufficiency for the purpose, but de-

fends himself, and resists the claim of the bill, solely on the ground that the testator had no interest in the Lodi print works or its business. If his allegation is unfounded, there is no good reason why a decree should not be made against him personally. The allegations of the bill are quite sufficient to justify a specific prayer for that purpose. If the bill had contained such a prayer, I do not see how the defendant could have varied his answer to meet the claim for such relief. He is not prejudiced by being deprived of the opportunity of meeting, by his answer, the allegations and charges which constitute the proper foundation for such a decree.

Have the complainants established the material allegation upon which their case rests—that Archibald Bryce, at the time of his death, was jointly interested in the "business or concerns of the Lodi print works" with the defendant, Robert Rennie? The answer denies that the testator had any interest, at the time of his death or at any other time, either directly or indirectly, with the defendant in those works.

The Lodi print works are located in the county of Bergen. There is real estate attached to the works, embracing a large number of acres of land, upon which are suitable buildings and improvements for carrying on the kind of business designated by the name of the works. The title to the real estate is in the name of the defendant, Rennie, and has been since the year 1844. While the title has been in him, the business has been conducted in his name. He has been the ostensible proprietor and owner of the works and of the business. During this period, up to the time of his death, the testator resided in the city of New York. He had charge of the office and books of the Lodi works in the city. Ostensibly he was the chief clerk. His connection with the works was notorious and acknowledged. This appears from the evidence on the part of the defendant as well as of the complainants. For a number of years, to the time when the defendant became proprietor of

the works, the works had been owned by the testator and James Rennie, the brother of the defendant. The testator and James Rennie carried on the business as partners, the testator occupying the same position in the city as he did afterwards when the works and business were carried on in the name of the defendant. With this relationship in business existing between the testator and the defendant, on the twenty-first day of March, 1846, the testator executed his will. The will commences with the following introduction to its provisions: "I, Archibald Bryce, aged sixty years and upwards, being desirous to provide for the maintenance and comfort of my sisters, hereinafter named, and for the payment of the legacies herein after specified, and at the same time to prevent any interruption or interference of or with the business or concerns of the Lodi print works, wherein I am jointly interested and concerned with Robert Rennie, of Lodi, in the state of New Jersey, and also to prevent an injudicious sale of my undivided third of the property at Bull's ferry, in the said state of New Jersey, known as the Leake estate, which two properties compose the bulk of my estate, do make, publish, and declare," &c. The testator then gives the annuities to his sisters, two of the complainants, a legacy to Andrew Macfarlane, one of the defendants, and a legacy to Mrs. Bradly. He disposes of his household furniture, provides for the payment of his funeral expenses, and then gives the "residue and remainder of his property, real and personal, of every kind and description," to Robert Rennie. He then declares, "I expressly charge the aforesaid specified legacies and annuities upon all my property, real and personal; but I expressly direct, that while and so long as the said Robert Rennie shall pay the legacies and annuities aforesaid he shall not be interrupted nor brought to account, nor hindered nor molested in any way in carrying on the said business and works as usual." Peter Rennie, a brother of the defendant, is one of the witnesses to the will. The. testator died on the 29th of March, 1849.

On the 4th of April, 1849, the defendant addressed a letter to Magdalene Bryce, one of the complainants. After expressing his sympathies upon the occasion of her brother's death, and giving an account of his last sickness and his burial, and recurring to the fact, that the deceased and himself had been associated together for nearly seventeen years without the least interruption of their friendly intercourse, he writes as follows : " He left a will, leaving me his residuary legatee to all his interest in the Lodi print works or any other property he might die possessed of. He gives a legacy of $5000 to his landlady, Mrs. Bradly, $5000 to his friend Andrew Macfarlane, £200 sterling per annum to each of his sisters, during their lifetime, to be paid in half-yearly instalments, the first instalment in six months from his death; his gold watch and wearing apparel to his friend Mr. James Bradly, the husband of his landlady; Mr. Andrew Macfarlane and the writer of this to be his executors."

Here we have the declaration in writing of the testator, made on the 21st of March, 1846, that he was the joint owner with the defendant of the Lodi print works and of the business connected therewith. We have this writing, on or about the 29th of March, 1849, made known to, and committed into the hands of the defendant, as the trustee of the testator, to assert and maintain that right in part for the benefit of the complainants in this suit. We have the declaration of the defendant in writing, made to the complainants, endorsing and acknowledging the claim of joint ownership made by the testator. The defendant now denies that joint ownership, and in his answer to a bill brought against him to enforce the claim, contents himself with a bare denial of it, without giving any explanation whatever of the inconsistency of that denial with his previous admission of the truth and propriety of the claim. This letter of the defendant, unexplained in any manner, seals his mouth against denying or disputing the claim. Not only is it unexplained, but it

2 Q*

is difficult to suggest, and his counsel in argument did
not suggest, a plausible reason for the defendant's writing
such a letter, assuming the claim made by the testator as
to his interest in the Lodi works to be unfounded. There
is something remarkable in the language of the letter
connected with the denial and disclaimer which is now
made. The evil genius of the defendant seems to have
presided over his deliberations when he wrote it, and to
have dictated language to show that the admission was
made intelligently and with deliberation, and irreconcil-
able with any future denial. He does not content himself
with mentioning the fact generally, that the testator had
left him his sole residuary legatee of all his real and per-
sonal estate : such an admission was susceptible of the
explanation, that he had derived a knowledge of its con-
tents from hearsay, or that, in a hasty reading of the will,
the peculiarity of the disposition as to the *Lodi print
works* had escaped his notice. But as if to give emphasis
to his admission, and to close his mouth for ever against
its denial, he uses the emphatic and pregnant expression,
that the testator, by his will, had made him his residuary
legatee to all his interest in the Lodi print works. The
Lodi print works was all the property he thought worth
his while specifically to mention, as if he deemed that the
most valuable and the most important, as far as he was
concerned. And so it was, as has since been established.

There is really no necessity of referring to other evi-
dence in the cause for the purpose of establishing the
fact, that the testator was jointly interested with the de-
fendant in the Lodi works. There is much evidence
tending to that result. But it is important to refer to
some of it, more particularly for the purpose of showing
the real position which the defendant occupies towards
the complainants, and how he should be dealt with by a,
court of equity under the circumstances.

On the 21st of May, 1849, the defendant, Rennie, with
his co-executor, Andrew Macfarlane, proved the will be-

fore the surrogate of New York. Under ordinary cir-
cumstances, the mere fact of proving the will would not
be regarded as evidence against the executor as affirma-
tion of a claim set up by the testator to property, the title
to which was a matter of dispute between the executor
and testator. Upon the doctrine of *election,* if the de-
fendant, as devisee and legatee, accepts the devise of the
Leake estate and the legacy of the residuary personal
estate, he must make good the testator's disposition of
the Lodi print works.

But the doctrine of election is not involved in the con-
troversy. It is the peculiarity of the property in dispute,
the ostensible position the executor and testator had oc-
cupied towards it in their business relations up to the
time of the latter's death, the fact that the testator left no
other property out of which the annuities and legacies
could be satisfied, and the endorsement which the defend-
ant gave to the testator's assertion of his right in the pro-
perty in his letter to one of the complainants—it is its
connection with these circumstances that makes the fact
of the defendant's proving the will some acknowledg-
ment of the right which the testator asserted. Why did
the defendant prove a will which, from its character, was
calculated to vex and harass him? Why did he assume
the execution of a trust which raised a claim to, and dis-
posed of one half of his own property? These were per-
tinent questions for the defendant to answer. A full op-
portunity has been afforded him to do so, but the only
response is the admission that he proved the will, and as-
sumed the execution of its trusts, without any explana-
tion of his object in doing so. The fair inference is, that
he did not, when he proved the will, intend to dispute
the testator's title. Under the circumstances, if he did
at the time meditate the design of questioning the testa-
tor's title, it was a fraud in him to take out letters testa-
mentary. By that act he possessed himself of all the
documents, books, and papers of the testator, by which

the right of the latter in the property in question might have been established.

Again, on the 23d of November, 1849, the complainants, residing in the city of Glasgow, Scotland, executed a power of attorney appointing Joseph C. Hornblower and Frederick T. Frelinghuysen their attorneys to collect and receipt for the annuities due and to grow due to them under the will of the testator. The attorneys went to the works at Lodi, and there presented their power of attorney. The defendant expressed his satisfaction that some one was authorized to act for the complainants, and his readiness to meet their demands, and appointed an early day for a meeting at the office of a counsellor at law in the city of New York, who was the counsel of the defendant and of the executors. The meeting took place according to appointment, and the defendant then and there, with the approbation of his counsel, paid to attorneys of the complainants the amount then due upon the annuities. It was then arranged that the attorneys should procure an affidavit to show that the annuitants were in life at the time the second payment of the annuities fell due, and that, upon such affidavits being procured from time to time, the annuities should be paid. When the second payment fell due, the necessary affidavit was procured, and was presented to the counsel of the defendant, as had been arranged. The counsel then informed the attorneys that no more money would be paid, and the only reason that he gave was, that the concern (to use his language) had become insolvent, or had been obliged to stop payment, and the defendant was making arrangements to wind up and close the concerns and business of the print works at Lodi. The attorneys asked if any objection was made to the affidavit, and the reply was, that there was not. Considerable conversation then took place, and no intimation was made that payment was refused on the ground of the testator's having no interest in the Lodi works. The only reason for the refusal was,

Rennie *v.* Crombie.

that the concern was insolvent. The attorneys then called upon the defendant, at Lodi, and demanded payment of him. He replied, that he supposed Mr. Chase (the counsel referred to) had informed them as to the matter. They then related to him what had been said by Mr. Chase. The defendant then said that the property had been mortgaged. Upon being asked whether the testator had consented, he said that the accounts had been made up shortly before his death; that the property was mortgaged for all it was worth; and that Mr. Crombie (one of the complainants, and husband of one of the annuitants,) might take it, if he chose. He talked of advances made to Crombie, and but for that the concern would have done well enough. He said the testator would have altered his will if he had lived three days longer; that he knew the condition of the concern, and that he could prove this.

It is a fact of great importance, that notwithstanding all that has been said and done in reference to this matter, no denial or question has ever been made, by any one, as to the testator's interest in the Lodi works until the defendant filed his answer in the cause.

What explanation does the defendant make, in his answer, of all these facts and of the conversations which have been had in relation to the matter in controversy? His answer is nothing more than a mere denial of the fact, that the testator was interested in the Lodi works, without any attempt to reconcile his previous conduct and the facts which have been referred to with the denial which he now interposes. The bill charges the fact, that his counsel put his refusal on the ground of the insolvency of the defendant, and that the defendant gave as a reason for not paying, that the defendant and the " concern" were insolvent and unable to pay its debts. The answer, as to what was said about the insolvency of the defendant and of the " concern" is evasive. If it is intended as a denial of the charges in the bill upon that

subject, then it is most satisfactorily disproved by the evidence in the cause. I cannot but notice one part of the answer in connection with the charges in the bill, as to what was said on the subject of insolvency. The bill charges that Mr. Chase said that Robert Rennie had become insolvent, or had been obliged to stop payment, and was making arrangements to wind up and close the concern and business of the said print works at Lodi. The defendant puts on file an answer, which is in the handwriting of Mr. Chase, and drafted by him as the defendant's counsel, in which, as to this charge of what was said by Mr. Chase in the interview referred to, the defendant is made to say, that he has " no knowledge or information as to what passed between the said attorneys in fact and Nelson Chase, except that he has been informed, by said Chase, that the said Chase informed them that there were no assets in the hands of this defendant belonging to the estate of the said Archibald Bryce with which to pay said annuities, or any part thereof." Now certainly, if the defendant was under the delusion that he could impose upon this court such an answer as a denial to the charges made in reference to this interview, his counsel ought to have warned him of his mistake. If Mr. Chase could have denied the charges in the bill, he would have told him so, and given to his client the benefit of the denial. I can only say, it would have been much more to the defendant's advantage to have obtained the real truth, whatever it might be, from his counsel, and candidly to have given it, than to have answered in a manner to manifest a disposition on his part to conceal and pervert the truth. He has lost his credit for candor, and has placed himself in a worse position than he would have been by a full admission of the charges.

There are very many facts in the case to which I have not adverted. I am perfectly satisfied, from the evidence in the cause, that the defendant is *estopped* from denying that the testator was jointly interested with him in the

Lodi print works and its business, and that he has placed himself in a position to make himself personally liable to the complainants for the payment of their annuities.

The question remains as to the decree that shall be made. I regret that more attention was not given to this part of the case by the counsel on the argument. It causes me some embarrassment, and is, indeed, the only difficult part of the case.

One prayer of the bill is for an account against the executors. The bill seems to have been framed under the idea that this was the appropriate relief. There has been objection made to the frame of the bill, or in reference to parties. The only issue made by the answer is the one I have considered, as to the right to the property. There can be no general decree for account against the executors. The domicil of the testator was in a foreign jurisdiction. Letters testamentary were taken out there, and the estate has been partially administered there. The will has not been proved in this state, and no one can be called to account here in the capacity of executor, unless he has assumed the duties here according to law. 1 *Story's Eq. P.* § 179; *Morrell* v. *Dickey*, 1 *J. C. R.* 153; *Doolittle* v. *Lewis*, 7 *J. C. R.* 45; *Logan* v. *Fairlie*, 2 *Sim. & S.* 284; *Tyler* v. *Bell*, 2 *Myle & Craig* 89. But here is property subject to the trust in the hands of a person bound to execute the trust. A trust may be enforced not only against the persons who rightfully are possessed of the trust property as trustees, but also against all persons who come into possession of the property bound by the trust with notice of the trust; and whoever so comes into possession is considered as bound, with respect to the especial property, to the execution of the trust. *Adair* v. *Shaw, Schoales and Lefroy's Rep.* 262. The property in question is subject to the payment of the annuities. It is in the possession of Robert Rennie, and the complainants have a right to follow the property into his hands, and charge

him as a wrongdoer. They cannot call upon him, as executor, to account *virtute officii*, but as being in possession of property which is applicable to the payment of their claims.

I can see no necessity for an account in this case, as it now stands upon the pleadings and admission of the parties.

The bill charges, in substance, that the testator's interest in the real estate belonging to the Lodi print works and in the business of the concern is sufficient for the security of their annuities. The defendant, Rennie, does not deny it. His answer must be taken as an admission that the property in his hands is sufficient. The only object of taking an account would be to ascertain that fact. The answer dispenses with that necessity.

In this view of the case, the other legatees are not *necessary* parties to the suit. They are out of the jurisdiction of the court. The complainants are following the defendant, Rennie, here to obtain from him their rights. The other parties may choose to rely upon the court where Rennie is bound to account. The complainants are not to be embarrassed or delayed in the prosecution of their rights on account of the absence of other parties. They are entitled to the fruits of their superior vigilance. *Colt* v. *Lesnier*, 9 *Cow.* 329. If not *necessary* parties, then, although made parties, if they do not appear they may be disregarded in the final decree. *Edwards on Parties in Chancery* 3, 11.

I think the proper decree is a reference to a master to ascertain what amount the defendant, Robert Rennie, should pay into court to be invested to secure the annuities, and that upon his refusal to make such payment the real estate should be sold. If one half of the sum raised by the sale is not sufficient, then the other half should be appropriated for the purpose; and if there is still a deficiency, Robert Rennie must be decreed to make it good.

The appeal was argued by

*A. O. Zabriskie* and *William Halsted,* for appellants.

*Frederick T. Frelinghuysen* and *J. P. Bradley,* for respondents.

The opinion of the court was delivered by

WHELPLEY, J.   Upon the main question in this cause I coincide with the Chancellor, for the reasons stated by him—that Archibald Bryce, at his death, had a joint interest in the business and concerns of the Lodi print works; but I dissent from his conclusion, that Rennie has made himself personally liable for the legacies of this respondent.

It would seem, from the opinion of the Chancellor, that on the argument before him but little attention was given as to the mode of relief, and that he was left to invent one, the effect of which was not discussed.

The decree charges all the print works with the payment of the legacies, by a lien declared to reach back to the death of Bryce.   It also charges Rennie personally with payment of the annuities due, and directs him to give security for the payment of those to become due, by payment into court of a fund sufficient for that purpose; and upon refusal to make such payment, directs the real estate to be sold, and one half the proceeds to be appropriated for that purpose: if that be not sufficient, then the other half, and that Rennie make good the deficiency.

Did the case, as it stood, warrant such a decree?   I think it did not.   He should not have been held personally responsible without any account or investigation of the value of Bryce's interest in the real estate and partnership property.   No sound principle is perceived on which the decree can be supported.

When this bill was filed, the complainants were in possession of all the facts on which such liability could be rested.   The inventory had been filed, the will proved in

VOL. I.                    2 R

New York, the defendant had assumed the executorship, the letter to Magdalene Bryce had been written and received, the interview between Rennie and the attorneys of complainants had taken place, and Chase had said to them that Rennie was insolvent, and would not pay, except on suit; Rennie had posessed himself of all the goods and property of Bryce, he had refused to prove the will in New Jersey.

All these facts are set forth in the bill; no new material fact has been disclosed in the evidence. Yet this bill contains no prayer asking for a decree against Rennie personally. It is filed with an entirely different aspect—its prayer is, that the property and interest of Bryce may be devoted to the payment of the annuities, upon the distinct ground that this property was charged by the testator, Bryce, with that burthen; and it further asks for the appointment of a receiver to take charge of the whole partnership estate. Such a bill, containing such a prayer for specific relief, the defendant was called upon to answer.

Upon such a bill, presenting for trial such an issue, to permit the complainants at the hearing to ask for a decree against the defendant *in personam*, unless the case disclosed by the answer shows facts upon which he ought to be held personally liable, would be a complete surprise. The prayer for special relief is not in such a case sufficient. Relief granted under that prayer should be *ejusdem generis* with that of the special prayers. It must be consistent with that specifically prayed, for the court will not permit a defendant to be taken by surprise. 1 *Danl. Ch. Pr.* 435, and cases cited in notes.

The bill is substantially a bill for an account of the interest of Bryce in the partnership, and for the payment of the annuities out of that interest, if sufficient.

The defendant answered it by denying the existence of the partnership and joint interest, and insists that he is not liable to account to the complainants claiming under

Archibald Bryce; he has not admitted that Archibald Bryce had, at the time of his death, property which came to the hands of defendant sufficient to pay the annuities, or any part of them.

If the greater includes the less, he has denied, by a denial, that Bryce had any interest in the partnership, the *sufficiency* of that interest to pay these annuities. Such a denial is not a negative pregnant. The defendant was not called on to answer a charge containing several distinct specifications, so that a denial that Bryce had all, would be an implied admission that he had some. It is a denial of the whole of an entire thing.

By no fair process of reasoning can it be shown that defendant's answer admits, by necessary or fair implication, that if Bryce had an interest in the print works and its business that it was sufficient to make the annuities.

To take the charge in the bill in its most extensive sense, it is, that the testator's interest in the real estate belonging to the Lodi print works and in the business of the concern is sufficient for the security of the annuities. To this the answer is, he had no interest at all.

How could the defendant swear that Bryce had no interest in the property and business, and that his interest in them was insufficient for the payment of the annuities? The two statements are utterly incongruous; they cannot stand together—the last implies the falsehood of the first.

At law in replevin, a defendant may plead *non cepit*, and by a distinct plea avow the taking, but he could not swear to the truth of both pleas without perjury. I should not have thought it necessary to notice at so much length this point, if it had not been pressed upon the court with so much pertinacity and apparent earnestness. The propositions I have stated are so nearly self-evident as to be almost incapable of demonstration.

Upon a bill filed by one claiming the existence of a partnership between himself and another, and asking for

an account of the partnership, the defendant may deny the existence of the partnership, and thus excuse himself from rendering an account. The court will not compel him to render an account before the right to account is established. *Story's Eq. Pl.* 668, 669; *Beame's Pl. in Eq.* 123 to 128; *Jeremy's Mitford* 231; *Drew* v. *Drew* 20, and *B.* 159; *Sanders* v. *King, Mad. & Geld.* 61; *Spring* v. *Edgar*, 2 *S. & S.* 274, 281.

Whether this objection must be taken by plea or answer is immaterial, as this point does not arise on exceptions to the answer. The property in question, to the extent of Bryce's interest in it, is subject to the payment of the annuities. It is in the possession of Robert Rennie, and the complainants have a right to follow it in his hands, and may not be denied relief because the will is not proved in this state. A trust may be enforced not only against those rightfully in possession of the trust property as trustees, but against all persons who come into possession of the property with notice of the trust.

Did Rennie come into possession of the property by right or as a wrongdoer?

If a partnership existed, on the death of Bryce the legal interest in it survived to Rennie—as such survivor, he was to settle up the business; but in addition to this, for some unknown and mysterious reason, Bryce had agreed that all the property should stand in Rennie's name; that he should not appear to the public as having any interest. So it remained at Bryce's death. It cannot be pretended that Bryce, while living, could have charged Rennie as a wrongdoer for holding the property as his own. The complainants do but succeed to his rights.

Again, the personal estate came into his hands as executor and by right. But even if the property of Bryce had consisted of goods and chattels alone, and had not been left in Rennie's hands by Bryce; if Rennie had taken possession of them without any authority as an executor, they being the sole property of Bryce, he would have

been but an executor *de son tort*, and only liable to a cred-itor for their value; he would not have incurred a liability for all the debts and legacies of the testator. In enforcing such a liability, equity follows the law; it cannot visit a wrongful act with consequences almost penal.

But it is said the defendant's answer is false—Bryce had an interest in the property. The court have so found, and that finding should have the same force as an admission in the answer. That is true. What, then, is the finding of the court? It is that Bryce had an interest in the property, the extent and value of which does not appear.

Where the extent of the interest of one of two partners is not fixed by the agreement, and is not proved, the law presumes it to have been a moiety, each to have had an equal share. *Story on Partn.* 24; *Collyer on Partn. B. D., ch. I,* § 169, *p.* 105, 161; 3 *Kent* 28, 29; *Peacock* v. *Peacock,* 16 *Ves.* 66.

Rennie cannot be held personally liable because he did not produce the books of the business. He was not bound to do this before a decree to account; he might do so or not as he saw fit or was advised by his counsel. Had the complainants wished them as evidence of the existence of a partnership, notice to produce them might have been given, and if refused, evidence of their contents might have been given. The nonproduction of the books, after notice to produce them, would have been a circumstance against Rennie. The suppression of testimony is always a strong circumstance against him that is guilty of it, but mere nonproduction is not entitled to any such weight. The fair presumption is that Rennie would have produced the books, if he had been notified to do so. He has never refused. There is no evidence that he has ever destroyed a single paper, or refused to the complainants permission to examine anything they had a desire to see connected with their claim.

We must bear in mind that the complainants are mere legatees, and as such, what a court of equity calls volun-

2 R*

teers.  They claim a gift from Bryce, not a debt due by him.  Their rights are only such as he had, and are subject to all the infirmities attending his rights.  If he chose to involve his affairs in obscurity they have no right to complain—it was his right to do so if he chose.  These complainants are the mere objects of his bounty—they must stand in his shoes if he had in his lifetime conveyed all his property to Rennie to avoid payment of his debts ; a court of equity would not relieve him coming with a bill to get it back, nor would they give his legatees any better audience.  The complainants are women, and as such entitled to our sympathy as men, but not as judges. We cannot eke out the evidence to relieve them because we may feel that their just expectations may otherwise be disappointed ; nor can we invent a new rule upon which to make the defendant liable for tens of thousands of dollars, by way of punishing him for what we may think a false denial in his answer.  The Court of Chancery does not sit to punish crimes by giving the property of the offender to another; it sits to administer the law of the court by fixed ascertained rules.  That law is equity, not vengeance.

The great argument of complainants' counsel in support of the relief invented by the Chancellor was, " that he that doeth iniquity shall not have equity."  That maxim applies to a complainant seeking relief, but is no authority for giving against a defendant a decree not supported by law or evidence.

Rennie paid the first semi-annual instalment of each annuity; he did not, at the time, deny the sufficiency of the property charged to meet the payments.  Two funds were charged, the Lodi print works and the Leake estate. In view of this, I do not think the payment of the two instalments to the attorneys, without any statement of the insufficiency of the interest of Bryce in the print works and business, affords sufficient ground to support a presumption to conclude the defendant on that point.

The fact of payment in silence was not an admission of the sufficiency of the interest in the print works alone to answer not the payment of one instalment merely, but of a sucession of instalments, for the life of the legatees or annuitants.

Payment of interest upon a legacy by the executor for *a number of years*, coupled with other circumstances, has been held to dispense with the necessity of an account, to amount to an admission of assets; to an assent to the legacy. Such a course of conduct would warrant an inference that the executor had made the legacy his own debt.

It would be unfair to permit the executor, who had, by long continued payment of interest upon a definite sum left as a legacy, lulled the legatee to sleep, and prevented his availing himself of his legal remedies to put the legatee to proof of sufficiency of assets, where perhaps, by lapse of time, proof was impossible.

In such cases executors have been, with great propriety, held personally liable, and an account has been dispensed with. Such cases have proceeded upon the ground of an express promise to pay the legacy, or that to permit a denial of assets after such conduct would be to permit a fraud to be perpetrated by the executors. *Holland* v. *Clark*, 2 *Y. & C. C. C.* 319; *Rothwell* v. *Rothwell*, 2 *Sim. & St.* 217; *Bradley* v. *Freath*, 3 *Sim.* 143; *Attorney General* v. *Chapman*, 3 *Beav.* 255; *Barnard* v. *Pumfriett*, 5 *Mylne & Cr.* 63; *Rowley* v. *Adams*, 7 *Beav.* 395.

But this case does not fall within the principle of these cases. The legatees now before the court were promptly told, when the period for the second semi-annual payment became due, that they must assert their right by suit. They could not have sustained any subtantial injury by the extremely short delay that had intervened between that time and the death of Bryce.

The complainants are entitled to an account, in which Rennie must be charged, in addition to his own moiety of the assets, with having received also Bryce's moiety,

and he must show, if he can, that Bryce's moiety of the assets was not sufficient for the payment of these annuities, and if not sufficient, what the deficiency was. There must be a decree that these annuities be paid and secured out of Bryce's interest. The decree of the Chancellor, that Rennie be held personally responsible, and that the whole property be sold to pay and secure the annuities, must be reversed, and the case remitted, to be proceeded in according to law and the opinion of this court.

OGDEN, J. My conclusions in this case are—that Mr. Bryce has been shown to have been, at the time of his death, an equal partner with Robert Rennie in the Lodi print works, and in all the business then connected therewith; that although Rennie's answer, which was made under the advice of a counsellor who was acquainted with the affairs of *the works,* absolutely denies any partnership between them, yet that it ought not to be taken and held to be such plenary evidence of admission of assets as to preclude him from showing, after the fact of a partnership has been established by a decree, what the true condition of the firm was at the time of Mr. Bryce's death— whether it was insolvent, barely solvent, or insufficient, in whole or in part, to meet the bequests made by the will of Mr. Bryce; that the decree of the Chancellor should be affirmed as to the existence of the partnership, but that it should be reversed so far as it determines that this is not a proper case for an account upon the pleadings and admissions of the parties; that an account should be taken before a master of the partnership property at the time of the death of Mr. Bryce, its situation and value, and also of the debts then existing against the firm; that in stating the account, the partnership estate should be *assumed* to have been sufficient to pay the debts of the print works; and that the burthen of proof should be put upon Mr. Rennie, to satisfy the Court of Chancery, beyond a doubt, that the assets and property of Mr. Bryce

were at the time insufficient to pay his debts and to respond to the full payment of the bequests given in his will.

The following dissenting opinion was read by

VREDENBURGH, J. Upon the pleadings and proofs, it is too plain for argument that Archibald Bryce was a partner with the appellant in the Lodi print works, and that upon the death of Bryce the joint property came to the possession of Mr. Rennie. It is not, perhaps, so apparent, but I am equally satisfied that that interest of Bryce, whatever it might have been, was sufficient to pay all his debts and legacies.

In the first place, it is charged in the bill, that at the death of Bryce there were sufficient assets to pay the said annuities, and that specific real estate and the works, buildings, machinery, water power, instruments, tools, and fixtures of the partnership came to the hands of Mr. Rennie; that the partnership was not insolvent; that it was worth much more than sufficient to pay all its debts, and that upon a settlement there would have been at the death of Bryce in the hands of Rennie, as surviving partner, assets sufficient to pay the said annuities.

The answer denies that they were partners, but does not deny that, if they were partners, the assets would have been sufficient.

Upon the assumption, then, that there was a partnership, the answer does not deny sufficient assets. If upon the evidence we cannot resist the conclusion that there was in fact a partnership, the want of all denial or explanation in the answer is very strong evidence of their sufficiency; for if they were not in fact sufficient, we are to presume that he would have put his defence upon a true and good ground, and not upon a false one.

But the evidence of sufficiency of assets does not by any means stop here. It does not appear that there were any debts of the testator. If they were partners at all, the

presumption is that they were equal partners. The property enumerated in the bill and the evidence of the prosperous condition of the business, from 1845 until the death of Bryce, make it very probable that the assets were sufficient. There is no evidence that the one half of the property of the Lodi print works, in 1849, was not sufficient to pay all the debts and legacies of the testator.

But again, in the appellant's letter to the appellees, dated April 4th, 1849, he says, " that the testator's mind was clear and unclouded to the very last, and when conversing with him on the event of his death, seemed resigned, and even cheerful. We have been associated together for nearly seventeen years, in seasons of much depression and difficulty, and yet during the whole period we have never had a misunderstanding, and I *certainly shall feel as I had lost a friend.* He left a will, leaving to his residuary legatee all his interest in the Lodi print works, or any other property he might die possessed of. He gives a legacy of $5000 to his landlady, Mrs. Bradly, $5000 to his friend, Andrew Macfarlane, £200 sterling per annum to each of his sisters during their lifetime, to be paid in half-yearly instalments, the first instalment in six months from his death. His gold watch and wearing apparel to his friend, James Bradly, the husband of his landlady. Andrew Macfarlane and the writer hereof to be his executors." Rennie had lodged the will for probate in the surrogate's office in New York on the 31st March, 1849, and this letter bears date four days afterwards, and shows not only that he had read the will before lodging it in the office, but also how minutely its contents were impressed on his memory, as it is almost a transcript from the will. Thus acquainted with the contents of this will, the defendant lodges it for probate on the 31st March, 1849. On the 21st May he proves this will, and is installed as its executor and trustee, and under it he takes possession of all the property and papers of the testator, and has ever since used and possessed the same.

Rennie *v.* Crombie.

The defendant cannot set up that the will was the result of any mental hallucination on the part of the testator, for he says, in this letter, " his mind was clear and unclouded to the very last," which implies not only that it was clear and unclouded when he died, but that it had never been otherwise. Nor can Mr. Rennie set up that he was induced to prove this will by any expectation that the testator had other property, for the residuary legatees are expressly told, in the will itself, that his interest in the Lodi print works and his one-third of the Leake property at Bulls ferry compose the bulk of his estate. Nor could the defendant have been ignorant of the testator's interest in the Lodi print works, and their proximate value. Under these circumstances, the proving of the will, the taking possession of the property, and acting under it for now nearly ten years, is the most clear admission that the testator was possessed of sufficient property to pay all his debts and legacies. With his knowledge of the affairs of the Lodi print works, by proving the will he made the language of the will his own, and must be deemed to acquiesce in the truth of its assertions; and assuming these to be true, can there be any doubt that there was sufficiency of assets?

Again, the object of the will, as declared upon its face, was to prevent any interruption or interference of the business or concerns of the Lodi print works and to prevent any injudicious sale of his one-third of the property at Bulls ferry, and at the same time to provide for the maintenance and comfort of the testator's sisters and for the payment of legacies. The only way in which this could be done was in the manner provided in the will, *viz.* by making the defendant, the residuary legatee, subject to the legacies. With this declared intent on the face of the will, the defendant proves the will and takes the property. Now, with the knowledge the defendant possessed of the whole affair, when he saw fit to prove the will and answer its duties, not only as executor but as

trustee, does he not say most distinctly by his acts, not only that he and the testator were partners, but also that there were ample assets to pay the annuities?

But again, the testator died on the 29th of March, 1849. On the second day afterwards, perhaps before he was buried, the defendant lodged the will with the surrogate for probate. Does this not indicate the time of one hurrying to make sure of a great advantage, rather than of one about knowingly to charge himself and his property with forty or fifty thousand dollars of another man's legacies? Did it ever before happen, in the history of the world, that upon the dying of an old and pennyless clerk, who in the full possession of his senses left a will asserting that he owned the half of his employer's property, and charging upon it $40,000 or $50,000 to his own relations, and making his employer his executor and trustee for that purpose, that such employer should be so eager to prove such will that he could not wait till the clerk was buried? Can we account for such an act on the part of Mr. Rennie, with his full and admitted knowledge of all the facts, except upon the ground that he well knew that the testator had ample assets, not only to pay all his debts and legacies, but also to leave a large surplus to himself, as his residuary legatee?

Again, there is strong internal evidence in this letter we have already quoted, dated the 4th April, 1849, that at that time the defendant considered this will as conferring on him a benefit, and not an evil. The will was set down for probate on the 21st May, 1849, a time barely sufficient to convey the intelligence across the Atlantic and to enable the heirs to contest the probate. Yet nothing is said in this letter about the time when the heirs must appear to contest the probate. The letter does, however, remind them that it would not be worth while to contest it on the ground of testamentary capacity. He tells them that he was with the testator a few hours before his death, and that his mind was clear and unclouded to the very

last. He next gives them a reason why they should not be dissatisfied with the provisions of the will in his own favor. He says, "we have been associated together for nearly seventeen years, in seasons of much depression and difficulty, and yet, during the whole period, we have never had a misunderstanding, and I certainly should feel as I had lost a friend. He left a will, giving $5000 to his landlady, $5000 to his friend, A. Macfarlane, £200 sterling per annum to each of his sisters during life, his gold watch and apparel to his friend, Mr. Bradly, and leaving me his residuary legatee to all his interest in the Lodi print works and any other property he might die possessed of, and Macfarlane and the writer hereof his executors. Thinking you might wish to have a lock of his hair, the inclosed I had cut off just previous to his interment." It would certainly be unbecoming in sisters to contest a legacy to so faithful a friend or to disturb one who could do so sacred a thing as to send them a lock of their brother's hair.

But let us scan the language of his letter a little more carefully, remembering that at the time it was written Mr. Rennie knew all about the circumstances as well as he does now; that he, while writing this letter, well knew that the testator did not own a dollar of the property he was willing away; that he was a mere clerk of his own executor, and that he was giving away $40,000 or $50,000 of property belonging not to the testator, but to the executor; that this clerk, in the full possession of his faculties, by his solemn last will and testament, gives away $40,000 or $50,000 of his master's property, gravely charges it upon his master's estate, and makes his master his residuary legatee and executor and trustee to attend to his own robbery. This letter was a very proper and natural result of the promptings of gratitude, if the testator had left a large property and made Mr. Rennie his residuary legatee and trustee; but it is impossible to con-

ceive that he could have written it if this will was nothing but a mockery.

But again he says in this letter, " he left me his residuary legatee to all his interest in the Lodi print works, or any other property he might die possessed of." Is it possible he could have said this with approval and without a word of explanation, if he knew at the time that this was all his own property, and not the testator's, or if he had not been well satisfied at that time that there would be a considerable surplus for the residuary legatee? But again he says in this letter, " and I certainly should feel as I had lost a friend." Why so? If the testator was his mere clerk, to whom, as his inventory shows, he had paid the last cent of his wages, who, in the full possession of his faculties had in his will asserted the monstrous falsehood that he owned half of his master's property, charged upon it $40,000 or $50,000 in legacies to his own friends, and left the residue to that very master, and appointed him his executor, is it not inconceivable that Mr. Rennie should yet say, at the very moment he discovers the fraud, " and I *certainly* should feel as I had lost a friend." But if, on the contrary, the truth was, that he had been befriended by the testator in his younger years; that in times of great depression they never had a misunderstanding; that this great property, although nominally in the name of Rennie, really belonged to the testator, and that after paying all the legacies, a very large residue would come under the will to Mr. Rennie, then might he not well exclaim, under the first impulses of gratitude, in his letter to these sisters, however you may feel because he has left you only £200 per annum, "I *certainly* should feel as I had lost a friend." The whole tone and language of this letter, when we take into consideration the entire familiarity Mr. Rennie must have had with all the circumstances, is utterly irreconcilable with any other belief than that Mr. Rennie must then have well known that, after paying the debts and legacies, there would have

come to him a large surplus, as residuary legatee, under Mr. Bryce's will.

But there is other evidence of the sufficiency of those assets. About the first of February, 1852, Chief Justice Hornblower and Mr. Frelinghuysen, having received a power of attorney from the sisters to collect there annuities, called upon Mr. Rennie, at his office, and exhibited to him the power of attorney. He told them he was ready to pay the annuities then due, and proposed to pay those falling due in March in advance, if he found it convenient so to do, and appointed a day for them to meet him at the office of his counsel in New York. They met there accordingly, and the defendant did then and there pay them the amounts then due, but said he had not found it convenient to anticipate those falling due in March. But it was distinctly agreed that for the future, when the annuities were called for, there should be an affidavit showing that the annuitants were still alive. Mr. Rennie then told the Chief Justice and Mr. Frelinghuysen that thereafter, upon receiving from time to time as the annuities became due, they need not trouble themselves to call upon or write to him about it, but that they could give the affidavits to his counsel, and his counsel would advise him, *and the money should be paid.* At the time of this payment, the defendant took the power of attorney, and put it upon record. He made no pretence, at this interview, that the estate was not able to pay. The defendant has refused to produce the receipt he took on that occasion. Now is not this an admission, as clear as words and acts can make it, of the sufficiency of assets? It is taxing our credulity too far when we are told he paid them out of his own funds. What! His clerk dying, to whom he had paid the last cent of his salary, claiming in his will to own the half of Mr. Rennie's property, and out of it giving to his own relations $40,000 or $50,000, and charging it upon Mr. Rennie's property, and leaving the balance to Mr. Rennie, and then that Mr. Rennie

Rennie v. Crombie.

should in effect agree to receive his own property by devise from Mr. Bryce subject to these legacies, and actually pay $1000 out of his own property, and further agree to pay $2000 per year during the lives of two sisters of this testator, who were living in England, and all from friendship to this presuming clerk.

I am perfectly satisfied, from the pleadings and proofs, that Mr. Rennie was intended to be, and was the great beneficiary under this will, and that in fact he did receive ample funds of the estate of Archibald Bryce to pay all the debts and legacies. This raises upon his part the highest moral obligation to pay them. The decree sternly, but justly, holds him to these responsibilities.

Is the decree so erroneous that we are compelled to interfere with it? The suit is not against the defendant as executor, to call him to account as executor. The bill simply avers that he has not proved the will in this state. Nor is it against him as executor de son tort. There is no allegation of that kind, nor could a legatee sustain a bill against him in that capacity. Nor is it against him to account as surviving partner nor as trustee. All the allegations in the bill in these regards are mere surplusage, and afford no ground for equitable relief; and if the bill can be sustained in no other view, it would have to be dismissed or stand over until the will was proved by somebody in New Jersey, and the executors made parties as such.

Rejecting the surplusage of this bill, it alleges in substance, on the 29th March, 1849, Archibald Bryce died in New York, leaving a will giving these annuities, and possessed in New Jersey of sufficient assets to pay them; that the defendant, or executor, proved said will in New York, but refuses to prove it, or file an inventory or account in New Jersey; that he has possessed himself of all the assets in New Jersey, and prays that the defendant should be decreed to pay them.

All these allegations are admitted by the answer or proved by the evidence, and appear to me to entitle the

plaintiff to a decree at once against the defendant indivi-
dually for the annuities without an account, and that not
upon the ground that he was executor *de son tort*, a trus-
tee, or partner, but because here was a fraudulent, vol-
untary, and malicious suppression of this will.

The executor took out letters in New York, but when
requested to take out other letters he refused to do so, al-
though he took possession of the property here.   He re-
ceived ample assets here.   It was his duty to take out
probate here.   The excuse given for not doing so is fri-
volous.   He knew these complainants resided in Great
Britain.   The not proving the will here under these cir-
cumstances was fraudulent, intending to wrongfully con-
ceal and keep possession of the property; it was volun-
tary, because at least he could have proved it under the
statute; it was malicious, because it was designed to ha-
rass and perplex the complainants in the legal prosecu-
tion of their demands.   Under these circumstances, courts
of equity hold him responsible at once for the legacy with-
out an account.

In the case of *Tucker* v. *Phipps*, 2 *Atk.* 359, the bill sug-
gests a legacy to the complainants, that the defendant has
destroyed or suppressed the will, and prayed *not* for an
account, but that the defendant might be decreed to
pay the legacy and interest; it appearing that the sup-
pression was fraudulent, voluntary, and malicious, it was
decided that the complainant was entitled to an immedi-
ate decree for the payment of his legacy.

In the case of *The Corporation of Clergymen's Sons* v.
*Swainson*, 1 *Ves. sen.*, the will left £500, to be put at inter-
est for the benefit of the plaintiff—the interest was paid
for several years by the husband of the executrix, who
then died; the bill was filed by the complainant against
the representative of the husband of the executrix, follow-
ing assets for payment, and it was insisted that a minute
account should not then be taken, but that the acts of the
defendant were evidence of sufficient assets.   It was de-

creed that the evidence was sufficient of assets in the hands of the representatives of the husband, the husband having continued to pay interest after the death of his wife, who was one of the executors. The court say the defendant shall not put these poor people to a minute account after this length of time, and after such acts by them, and no inventory taken. Nothing is more necessary than to keep executors to deliver inventories.

In *Hunt* v. *Mathews*, 1 *Vern.* 408, a widow, just before her second marriage, conveyed property to the value of £200 in trust for her children. The defendant, after his marriage, got possession of the deed, and suppressed it. The court said, the deed being suppressed by the husband, by which the particulars of the estate might appear, decreed him to pay the £800, without directing any account.

In *Wardour* v. *Berresford*, 1 *Vern.* 452, the master having reported that the defendant had suppressed some papers relating to his demand, disallowed the whole account, though the defendant swore he had produced all the papers, and although the Chancellor declared himself satisfied that all the papers were produced, yet for the reason aforesaid, disallowed the whole demand.

In *Dalston* v. *Coatsworth*, 1 *P. Will.* 731, the bill charged that the deed was burnt or destroyed. The court decreed the contents, as charged in the bill, upon the principle, that everything shall be presumed in *odium spoliatoris*.

In *Woodruff* v. *Barton*, 1 *P. Will.* 734, the devisee brought his bill against the heir, and it being made to appear that there was such a will, and that defendant had destroyed it, it was decreed that the defendant convey to the complainant in fee, and deliver up possession.

In *Hampden* v. *Hampden*, 1 *Brown's Par. Cases* 250, it appearing that a will had been suppressed by the defendant, it was decreed that, as the defendant had suppressed the will, to the intent that its contents might not be known, it ought to be taken as set forth in the bill.

In *Childerns* v. *Saxton*, 1 *Vern.* 207, the defendant had

taken out execution in breach of an injunction, and seized £150, and done other damage, the Lord Chancellor decreed that the defendant should make good the money, and satisfy all other damage the complainant should swear to, the Lord keeper, upon complaint made of this decree, said, in *odium spoliatoris* the oath of the party injured should be good to charge him who has done the wrong.

In *Rogers* v. *Soutten*, 2 *Keen* 598, the defendant, in his answer, denied assets, but facts were shown in the answer showing that he had used them. It was decreed that he pay personally without account taken.

In *Barnard* v. *Pumfrett*, 5 *Mylne & Craig* 63, there was a decree against the executor to pay legacies without reference to the state of assets, upon the ground of his having, by his acts and admissions, rendered himself personally liable.

It appears to me that the defendant is clearly within the principle of these cases. He has taken possession of the assets of the decedent in this state, as appears by the evidence, sufficient to pay all the debts and legacies He has, upon request, neglected or refused to prove the will in this state. He has filed an inventory here—he has refused to give any inventory when called upon. When brought into Chancery, he has denied all assets, and denied under oath that there are any assets at all. During the last eight years, since this suit has been going on, he has refused to give any account, or to put himself in a position in which he could be called to account in any way in any court of law or equity. He has thus far, by this course, baffled and delayed these legatees, knowing their far off residence and their helpless condition to enforce their rights. It was his duty, and the easiest thing for him, to have proved the will and filed an inventory. And now, at the end of nearly ten years' litigation, he asks to be considered an executor or trustee, and to be called in to settle an account. We think it is too late—

he ought to have done it before. If we send this case to an acccount the controversy is but just begun, and these legatees will be beyond the reach of fraternal kindness long before we see it reaches any fruit. How, at this length of time, on these conditions, are the legatees to show the amount? We cannot rely on the defendant to do it. If defendants has been put in this situation by his own acts, he cannot claim the benefit of the obscurity and uncertainty his own wrongful acts have thrown over the transaction; and upon the principle, that every presumption is to be made *odium spoliatoris*, by refusing to prove the will, by refusing to give an inventory, and refusing to put himself in a position by which he could be called to account, and by taking possession of the assets, he should be presumed to have had assets, even in the absence of proof of their sufficiency, much more so when the proof upon that subject is entirely satisfactory.

The decree, therefore, holding defendant personally responsible is right in substance, and is warranted by the facts charged in the bill, without any reference to the answer.

But it is said that the decree is not consistent with the special prayer of the bill; that the prayer is for account, and the decree against him personally. This is a misapprehension of the bill. The bill, indeed, prays for an account, but it also prays a decree against him personally, and the amount is only desired in aid of this personal responsibility. The decree, in holding the defendant personally responsible, is clearly within the specific relief prayed.

It is said, in the next place, that the decree makes the the annuities a lien on the land from 1849. Suppose it is so, is it any such error as requires us to interfere with it?

As to the mortgages in the bill, they have not appealed, and as to the defendant, it can make no difference whether he pays the annuities first or the mortgages.

As to any other creditors, they are not parties to this

suit, and cannot be bound by it. Nor would they be proper parties, for in this suit no account can be taken to bind them. As to the defendant, it can make no difference to his injury whether the decree makes the legacies a lien from the death of the testator or from the date of the decree. Nor is it necessary to discuss the question of a parol trust, for the decree is based upon the idea that the defendant, by his acts, has precluded himself from denying assets, or rather has admitted them.

When the Chief Justice and Mr. Frelinghuysen called upon the defendant for the second instalment, they were told they would receive no more until at the end of a lawsuit. How well this resolve has been kept this suit testifies. But every principle of law and justice calls upon us here now to say, that this shall be its end, and that its avails shall be remitted to these ladies before time shall have rendered useless to them the justice of our courts.

The decision of the Chancellor was reversed by the following vote:

*For affirmance*—Judges RISLEY, VALENTINE, VREDENBURGH.

*For reversal*—CHIEF JUSTICE, Judges COMBS, WOOD, CORNELISON, ELMER, OGDEN, SWAIN, WHELPLEY.